**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NORMA MIMS, Derivatively on Behalf of THE ALLSTATE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | **VERIFIED SHAREHOLDER** |
| | ) | **DERIVATIVE COMPLAINT** |
| THOMAS J. WILSON, ANDREA REDMOND, JUDITH A. SPRIESER, KERMIT R. CRAWFORD, SIDDHARTH N. MEHTA, JOHN W. ROWE, MARY ALICE TAYLOR, JACK M. GREENBERG, ROBERT D. BEYER, HERBERT L. HENKEL, STEVEN E. SHEBIK, and MATTHEW E. WINTER, | ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants, | ) ) | |
| and | ) ) | |
| THE ALLSTATE CORPORATION, | ) ) | |
| Nominal Defendant. | ) ) | |

Plaintiff Norma Mims ("Plaintiff"), by and through her undersigned counsel, respectfully submits this Verified Stockholder Derivative Complaint on behalf of nominal defendant The Allstate Corporation ("Allstate" or the "Company") against certain of its directors and officers named herein (the "Individual Defendants" as defined below). Plaintiff bases her allegations on personal knowledge as to her own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including, among other things, review and analysis of: (a) public filings made by Allstate with the U.S. Securities and Exchange Commission (the "SEC"); (b) press releases, postings on Allstate's website and other publications caused or allowed to be disseminated by the Company; (c) news articles, analyst reports and other public documents; and (d) public filings in the related federal securities class action lawsuit pending in

this Court captioned *In re The Allstate Corporation Securities Litigation*, Case No. 1:16-cv-10510 (the "Securities Action").

## INTRODUCTION

1.      According to its public filings, Allstate is a personal lines insurance company, offering homeowners, renters, motorcycle and automobile insurance.  The Company sells personal lines insurance through three brands: Allstate Insurance, Esurance and Encompass.  The "Allstate" brand is the Company's largest business segment, accounting for 90% of its total insurance business, and automobile insurance is the "Allstate" brand's largest business segment.

2.      After years of declining returns in the automobile insurance market, Allstate, under the direction of the Individual Defendants (defined below), sought to grow automobile policies in force ("PIF") and revenue while maintaining the Company's profitability.

3.      To accomplish this task, in 2013, the Individual Defendants began to lower the underwriting standards required for Allstate automobile insurance.  This maneuver increased revenue but also resulted in predictable losses, as the lower quality underwriting standards led to an increase in the frequency of automobile insurance claims.  In fact, by the fall of 2014, Allstate had experienced two consecutive months of drastically increased claims.

4.      On a quarterly basis, the Individual Defendants provided to investors information about changes in claims frequency, but, at first, refused to admit there was any increase at all. On October 30, 2014, in response to an analyst's question concerning claims frequency, the Company's President Matthew E. Winter ("Winter") stated that "***our frequency so far has been extremely favorable to prior year***," and, "***frequency trends have been good.***"[1]

5.      Then, when the increase in claim frequency could no longer be denied, the Individual Defendants refused to reveal the true cause – the relaxing of underwriting standards –

---

[1]   All emphasis is added unless otherwise noted.

and instead blamed "external" factors such as the economy and the weather. Yet these results were not as temporary as the weather.

6.     The truth would ultimately come to light on August 3, 2015, when the Individual Defendants caused Allstate to reveal that not only had the increase in claims frequency persisted for a third consecutive quarter, but also that the increase was proximately caused by the Company's aggressive growth based on significant reductions in its underwriting standards, as mandated by the Individual Defendants.

7.     In response, Allstate's stock price ***fell by more than 10%*** in a single day.

8.     While the Individual Defendants were regularly trying to conceal the true cause of the increase in claims frequency, and based on their knowledge of the true reason for the increase, several of the Company's senior officers and directors began selling their personally held Allstate common stock while their shares traded at artificially inflated levels. In total, Company insiders sold over 331,725 shares, reaping proceeds of over $22 million.

9.     After the Individual Defendants' disclosure that the true reason for the increase in claims frequency was their own decision to relax underwriting standards, the Company, as well as Winter, and the Company's Chairman and Chief Executive Officer ("CEO") Thomas J. Wilson ("Wilson") were named as defendants in the Securities Action.

10.     On February 27, 2018, the Honorable Robert W. Gettleman ("Judge Gettleman") denied the defendants' motion to dismiss the Securities Action, holding that the plaintiffs in the Securities Action had satisfied the heightened pleading standards of the Private Securities Litigation Reform Action ("PSLRA"), which governed the pleadings in the Securities Action, and noting that the plaintiffs "provide numerous allegedly misleading factual statements" and "have adequately pled scienter," *i.e.*, an "intent to deceive, manipulate, or defraud."

11.     As a result of defendants' breaches of fiduciary duty and other serious misconduct, the Company has been damaged.  Such damages include, among other things, costs incurred by Allstate in connection with the Securities Action and harm to the Company's reputation and goodwill.

12.     In connection with the allegations set forth herein and in accordance with Delaware law, on September 12, 2018, Plaintiff made a pre-suit demand (the "Demand") on the Allstate Board of Directors (the "Board") to investigate and commence an action against certain current and/or former directors and executive officers of the Company (*e.g*., certain of the Individual Defendants named herein).  A true and correct copy of the Demand is attached hereto as Exhibit A.

13.     The Company received the Demand on September 17, 2018.  *See* Exhibit B.

14.     It has now been seventeen months since Plaintiff issued the Demand, and Plaintiff has received from the Board no response whatsoever.

15.     The Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.  Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the

wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

18.     Plaintiff is a shareholder of Allstate and has continuously held Allstate common stock since at least 1999.  Plaintiff is a citizen of Georgia.

19.     Nominal defendant Allstate is a Delaware corporation headquartered at 2775 Sanders Road, Northbrook, Illinois 60062.  Allstate is therefore a citizen of Delaware and Illinois.

20.     Defendant Wilson has served as a director of Allstate since 2006.  He also has served as CEO of the Company since 2007 and President since February 2018.  From 2013 through 2015, Wilson received $48,188,801 in compensation from the Company.  Wilson is a citizen of Illinois.

21.     Defendant Andrea Redmond ("Redmond") has served as a director of Allstate since 2010.  From 2013 through 2015, Redmond received $732,694 in compensation from the Company.  Redmond is a citizen of Illinois.

22.     Defendant Judith A. Sprieser ("Sprieser") has served as a director of Allstate since 1999.  She also has served on the Audit and Risk and Return Committees of the Allstate Board, including as chair of the Audit Committee from 2013 to 2014.  From 2013 through 2015, Sprieser received $809,641 in compensation from the Company.  Sprieser is a citizen of Virginia.

23.     Defendant Kermit R. Crawford ("Crawford") has served as a director of Allstate since 2013.  He also has served on the Audit Committee of the Allstate Board.  From 2013

through 2015, Crawford received $777,751 in compensation from the Company. Crawford is a citizen of Illinois.

24.     Defendant Siddharth N. Mehta ("Mehta") has served as a director of Allstate since 2014. He also has served on the Audit and Risk and Return Committees of the Allstate Board, including as chair of the Risk and Return Committee in 2015. From 2014 through 2015, Mehta received $520,542 in compensation from the Company. Mehta is a citizen of Illinois.

25.     Defendant John W. Rowe ("Rowe") served as a director of Allstate from 2012 until May 2018. From 2013 through 2015, Rowe received $752,657 in compensation from the Company. Rowe is a citizen of Illinois.

26.     Defendant Mary Alice Taylor ("Taylor") served as a director of Allstate from 2000 until May 2018. She has served on the Audit and Risk and Return Committees of the Allstate Board, including as chair of the Audit Committee in 2015. From 2013 through 2015, Taylor received $735,784 in compensation from the Company. Taylor is a citizen of Alabama.

27.     Defendant Jack M. Greenberg ("Greenberg") served as a director of Allstate from February 2002 to May 2015. From 2013 through 2015, Greenberg received $570,122 in compensation from the Company. Greenberg is a citizen of Illinois.

28.     Defendant Robert D. Beyer ("Beyer") served as a director of Allstate from September 2006 to May 2016. Beyer formerly served as a member of the Company's Audit and Risk and Return Committees, including as chair of the Risk and Return Committee from 2013 to 2014. From 2013 through 2015, Beyer received $772,657 in compensation from the Company. Beyer is a citizen of California.

29.     Defendant Herbert L. Henkel ("Henkel") served as a director of Allstate from March 2013 to May 2017. Henkel formerly served as a member of the Company's Risk and

Return Committee.  From 2013 through 2015, Henkel received $757,875 in compensation from the Company.  Henkel is a citizen of Florida.

30.     Defendant Steven E. Shebik ("Shebik") formerly served as the Company's Chief Financial Officer ("CFO") and current serves as Vice Chair of Allstate and Chief Executive Officer of Allstate Life Insurance Company.  From 2013 through 2015, Shebik received $13,859,030 in compensation from the Company.  Shebik is a citizen of Illinois.

31.     Defendant Winter served as Allstate's President from January 2015 until February 2018.  From 2013 through 2015, Winter received $17,149,702 in compensation from the Company.  Winter is a citizen of Connecticut.

32.     Defendants Wilson, Redmond, Sprieser, Crawford, Mehta, Shebik, Rowe, Taylor, Greenberg, Beyer, Henkel and Winter are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers, directors, and/or fiduciaries of Allstate, and because of their ability to control the business and corporate affairs of Allstate, the Individual Defendants owed Allstate and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Allstate in a fair, just, honest, and equitable manner.

34.     Further, the Individual Defendants were and are required to act in furtherance of the best interests of Allstate and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit.  Each director and officer of the Company owes to Allstate and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

35.     Because of their positions of control and authority as directors and/or officers of Allstate, having knowledge of material, non-public information regarding the Company, the Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  To discharge their duties, the officers and directors of Allstate were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties the officers and directors of Allstate were required to, among other things:

a.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; and

d.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its reoccurrence.

36.     The Company's corporate governance documents and public filings confirm the oversight responsibilities of the Individual Defendants, as members of the Board and/or Allstate management.  In a proxy statement issued to Company shareholders in advance of Allstate's 2014 annual meeting (the "2014 Proxy"), the Company acknowledges that the "[t]he Board is responsible for the oversight of Allstate's strategy, business results, and management, including risk management," and that "[t]he Board reviews Allstate's overall risk position twice a year and uses external resources when appropriate to assess the enterprise risk and return management

process."   Similar disclosures are contained in proxy statements issued in advance of the Company's 2015 and 2016 annual meetings.

37.     In 2013, the Board created the Risk and Return Committee as a standing committee of the Board in order to, according to the 2014 Proxy, "enhance[] [Allstate's] capabilities to oversee the [C]ompany's risk and return practices . . . ."  The 2014 Proxy further explained that "[t]he entire Board remains fully involved in risk and return principles, practices, and results, as this is tightly linked to strategy for an insurance company," and that the Risk and Return Committee was created to "ensure sufficient expertise and continuity" in reviewing these policies.   Similar disclosures are contained in proxy statements issued in advance of the Company's 2015 and 2016 annual meetings.

38.     According to its charter, the Risk and Return Committee "assists the Board of Directors in fulfilling its oversight of management's responsibility for the Corporation's risk and return management structure and governance."

39.     Specifically, the Risk and Return Committee focuses on:

(i)     identification and evaluation of risks inherent in the Corporation's business, strategy, capital structure, and operating plans;

(ii)     identification and evaluation of opportunities to create and deploy risk capacity to improve returns;

(iii)     processes, guidelines, and policies for monitoring risks and returns, and;

(iv)     organization and performance of the Corporation's enterprise risk and return management ("ERRM") function.

40.     The Risk and Return Committee's charter highlights the specific relevant areas of responsibility, which include, but are not limited to:

- The identification and evaluation of the Corporation's risk and return trade-offs and overall balance.

- The review of the Corporation's operating plan from a risk and return perspective, including its current and emerging potential exposure to risks of various types and expected returns.

- The review of Allstate's chief risk officer's report on risk exposures, including strategic execution, culture, insurance, investment, financial, and operational risks, against risk measurement methodologies, if available, and the steps management has taken to identify, assess, manage, monitor, and report such exposures.

- The review of regulatory disclosures regarding risk, including those contained in the Corporation's annual report on Form 10-K.

- The consideration of the Corporation's processes and policies for determining risk and return appetite.

41.     According to its charter, the Risk and Return Committee's chair "reviews and approves meeting agendas, reports regularly to the Board and the Lead Director on the Committee's actions, recommendations, and any topics that it believes should be reviewed or discussed with the Board."

42.     The charter also provides that the Risk and Return Committee "will meet periodically with Allstate's chief risk officer and may meet separately with other members of management, including business unit risk officers," with the Company's senior internal audit executive "typically" attending all committee meeting.   These mandates are generally corroborated by the Company's public filings.  For example, the 2014 Proxy provides that "the [R]isk and [R]eturn [C]ommittee meets in executive session with the chief risk executive at each

meeting." Additionally, the 2014 Proxy discloses that "[a] number of our executives, including the CEO, CFO, general counsel, and chief risk executive, participate in risk and return committee meetings." Similar disclosures are contained in proxy statements issued in advance of the Company's 2015 and 2016 annual meetings.

43. The Risk and Return Committee met three times in 2013 and five times each year between 2014 and 2016. In 2013 the Risk and Return Committee was comprised of Henkel, Sprieser, and Beyer, with Beyer acting as the Chairperson. In 2014 the Risk and Return Committee was comprised of Henkel, Sprieser, Beyer, and Mehta, with Beyer continuing as Chairperson. In 2015 the Risk and Return Committee was comprised of Henkel, Sprieser, Mehta, and Taylor, with Mehta as Chairperson.

44. The Risk and Return Committee works hand-in-hand with the Audit Committee. Indeed, according to the 2014 Proxy, "[t]he chairs of the audit and risk and return committee are members of both committees to ensure integration at the Board level" and "enhance cross-committee communication at the Board level." Similar disclosures are contained in proxy statements issued in advance of the Company's 2015 and 2016 annual meetings.

45. According to its charter, the Audit Committee "assists the Board . . . in fulfilling its oversight responsibilities for," among other things, "[t]he integrity of the [Company's] financial statements and other financial information," and "[t]he [Company's] system of internal control over accounting and financial reporting and disclosures, enterprise risk . . . , ethics, and compliance with legal and regulatory requirements[.]"

46. The Audit Committee's charter highlights the specific relevant areas of responsibility which include, but are not limited to:

- The review of the Company's annual audited and quarterly financial statements, including management's discussion and analysis of financial condition and results of operations and risk factors.

- The review of the Company's internal control over financial reporting and disclosure controls and procedures that could significantly affect Allstate's financial statements.

- The review of disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the annual and quarterly financial reports about any significant deficiencies in the design or operation of internal controls over financial reporting.

- The review of risks discussed by the Risk and Return Committee for considerations in its review of the Company's control environment.

47. According to the charter, the Audit Committee's chair "develops meeting agendas and reports regularly to the Board and the Lead Director on the Committee's actions, recommendations, and any topics that it believes should be reviewed or discussed with the Board."

48. The charter further provides that "[a] least quarterly, the Committee meets separately with management, with the chief audit executive, and with the independent registered public accountant, and may meet with any other officer (including the chief executive officer, vice chair, chief financial officer, chief accounting officer, controller, chief compliance executive, chief risk officer, chief technology officer, or chief information security officer) or the independent registered public accountant without management present whenever the [Audit] Committee deems it appropriate." This mandate is corroborated by the Company's public

filings. For example, the 2014 Proxy states that "[a] number of our executives, including the CEO, CFO, general counsel, chief audit executive, chief compliance executive, chief risk executive, and controller participate in audit committee meetings. Senior business unit and technology executives are present when appropriate. Executive sessions of the committee are scheduled and held throughout the year, including sessions in which the committee meets exclusively with the independent registered public accountant and the chief audit executive." Similar disclosures are contained in proxy statements issued in advance of the Company's 2015 and 2016 annual meetings.

49.     The Audit Committee met eight times in 2013 and nine times in 2014 and 2015.

50.     In 2013 Sprieser, Beyer, Crawford, and Taylor served on the Audit Committee, with Sprieser as the chairperson. In 2014 Sprieser, Beyer, Crawford, Mehta, and Taylor served on the Audit Committee, with Sprieser continuing as the chairperson. In 2015 Taylor, Crawford, and Mehta served on the Audit Committee, with Taylor acting as the chairperson.

## SUBSTANTIVE ALLEGATIONS

**A.     Background of the Company and Its Auto Insurance Business**

51.     Allstate brand auto insurance is sold through both exclusive Allstate agencies and independent agencies. Exclusive Allstate agencies typically sell only Allstate branded insurance products. Independent agencies offer Allstate brand insurance alongside products from competitors.

52.     Insurance companies develop underwriting guidelines to determine whether to offer or decline insurance, as well as to determine the appropriate premiums to charge their customers. In setting and applying their underwriting guidelines, insurance companies take into account certain characteristics of the insured, such as prior driving behavior, as well as factors

such as location of residence. An insurance company seeking to maximize profitability will either charge such customers higher premiums or avoid insuring them.

53. Insurance companies can increase their policies in force by lowering underwriting standards and can decrease the number by raising underwriting standards. When a company lowers its underwriting standards, it generally results in an increase in the number of policies in force, which can result in increased revenues for the company, but not necessarily increased profitability. For example, if an insurance company increases its policies in force by lowering its underwriting standards and selling policies to more accident-prone drivers, as Allstate did in 2013, 2014 and the first half of 2015, it could end up paying out more in claims than it collects in premiums, resulting in a net loss on those new policies.

54. Allstate must develop rules and practices for underwriting auto insurance policies and file these guidelines with state regulators. However, Allstate can loosen its underwriting standards without having to change the written underwriting guidelines that it files publicly with state regulators. Allstate does this by means of a proprietary credit score known as the Insurance Financial Score, which Allstate uses as an input for its pricing and underwriting.

**B.  The Individual Defendants Focus on Growth Through Lax Underwriting Standards**

55. At the start of 2013, Allstate announced to investors that it was reordering its priorities and making growth its number one goal. During an earnings call on February 7, 2013, Wilson announced that "[l]ooking forward for 2013, our priorities are very similar to last year's ***but with an increased emphasis on growth,***" and the presentation that went along with the call indicated that Allstate would reorder its five operational priorities, with growth being its new number one priority.

56. To achieve this outcome, the Individual Defendants caused Allstate to incentivize its agents to target customers of other insurers to meet its growth expectations. Beginning in

2013, Allstate spent millions of dollars incentivizing independent agents to roll customers over to Allstate. As part of this practice, agents monitored when policies from other companies were set to expire and then would call policy holders to encourage them to switch to Allstate.

**C.      Claims Frequency Increases in the Auto Insurance Business**

57.      Allstate's claims frequency remained mostly flat or declining for years prior to its push for growth. As one analyst noted in August of 2013, "[auto] frequency for the last three years has . . . been pretty much nonexistent." Just over a year later, another analyst reported that Allstate's frequency trends "remained relatively benign."

58.      However, no later than the third quarter of 2014, Allstate experienced a steep increase in claims paid frequency, which reversed the Company's long-standing favorable frequency and profitability trends. Specifically, from the second quarter of 2014 to the third quarter of 2014, Allstate experienced a jump of four percentage points in the year-to-year quarterly rate change in auto bodily injury paid frequency, moving from a negative 3.8% rate change to a positive 0.2% rate change. In other words, in the second quarter of 2014, Allstate's bodily injury claims frequency trend was favorable and indicated that claims frequency was decreasing by 3.8% year-over-year; however, by the third quarter of 2014, that trend not only ended but had swung in the opposite direction, and was increasing by 0.2% year over-year.

59.      Further, Allstate's greatly reduced underwriting standards not only affected its bodily injury paid claims, but similarly affected its property damage (or "PD") paid claims. Property damage paid claims experienced a small improvement in year-over-year rate changes in the second quarter of 2013, but then, like bodily injury frequency, reversed course and increased in the third quarter of 2014, and thereafter experienced sustained and steadily increasing frequency rates through the third quarter of 2015.

60.    The Individual Defendants later ***admitted*** that they were aware of the frequency increase since at least October 2014.  Specifically, during an earnings call held on February 5, 2015, when analysts questioned Allstate management about claims frequency, Wilson said that Winter "has been waiting anxiously for your question, because he's spent [an] ***untold number of hours over the last really three months since we saw a tick-up in October [2014]***."

**D.    The Individual Defendants Conceal the Cause of the Company's Revenue Decline**

61.    The immediate impact that the increase in claims frequency had on Allstate's financial condition and operating results was significant.  The Allstate brand auto "underlying combined ratio," *i.e.*, its total costs, not counting certain unusual events such as major catastrophes, increased to its highest level since 2011.

62.    On October 29, 2014, the Individual Defendants caused the Company to issue a press release reporting Allstate's third quarter 2014 results (the "October 2014 Press Release"). The October 2014 Release stated, "[t]he Allstate brand grew insurance policies in force by 572,000, or 1.9% in the third quarter of 2014 compared to the prior year quarter, ***after reflecting a comprehensive plan to generate profitable growth***."

63.    Also, on October 29, 2014, Allstate filed with the SEC a Form 10-Q which reported the Company's financial results for the third quarter of 2014 (the "October 2014 10-Q"). The October 2014 10-Q failed to disclose the increase in claims frequency to date.  Having discussed the Company's "comprehensive plan to generate profitable growth," the Individual Defendants had a duty to include relevant information about how that plan was already generating higher claim frequencies for both bodily injury and property damage.  In addition, the Individual Defendants failed to disclose that the increase in claims frequencies was caused by Allstate's greatly reduced underwriting standards.

64.     On October 30, 2014, Allstate hosted the October 2014 earnings call.  During that call, in response to a question from a Janney Montgomery Scott analyst about whether Allstate was pricing for increased claims frequency, Winter stated that "*our frequency so far has been extremely favorable to prior year*," adding, "*so our frequency trends have been good*."

65.     On December 9, 2014, Goldman Sachs hosted an investor conference (the "December 2014 Conference") in which Allstate management, including Wilson and former Chief Financial Officer Shebik, participated.  During the conference, an audience member asked Wilson about Allstate's homeowners and auto rates and how confident Wilson was that profitability could be maintained.  Wilson responded in part by saying "We've *tweaked* our models to improve retention.  So if you look at the improved retention in our auto business, we are doing a better job of spreading those rate changes more effectively. *So I feel good about auto insurance in general in terms of its profitability. It doesn't mean frequency won't tick up, or we won't mess up in some State, or we don't mess up in some channel.*"

66.     After the market closed on February 4, 2015, Allstate issued a press release reporting the Company's fourth quarter and fiscal year 2014 and FY 2014 results (the "February 2015 Press Release").  In the February 2015 Press Release, Allstate first admitted that the Company's claims frequency had spiked.  It stated, "[a]n increase in claim frequency in the first two months of the quarter [October and November 2014] adversely impacted the combined ratio for auto insurance, with the Allstate brand auto combined ratio rising to 97.0[,] [which] was 1.7 points higher than the prior year." As a result of that disclosure, Allstate stock declined by 2.27% over the next two trading days.

67.     However, the February 2015 Press Release identified only external factors as the cause of the increase in claims frequency, and specifically the "***impact of precipitation in select markets and general economic trends***."

68.     The next day, February 5, 2015, the Individual Defendants hosted the February 2015 earnings call.  During that call, the Individual Defendants continued to blame the increase in claims frequency exclusively on external factors.

69.     For example, Winter reassured investors by stating: "***Let me start with what is not driving it. Number one, we saw nothing to indicate that it's a quality of business issue or that it's being driven by growth, which is a natural question that you would have*** . . . ." Winter explained the analysis that Allstate had conducted and repeated that they "***saw nothing in there that would indicate it was a quality of business or a growth-related issue***." Winter attributed the spike in frequency to "***two factors [that] traditionally drive PD frequency: miles driven and precipitation***."

70.     Winter further assured investors that the members of Allstate management closely study the issue to the point they are "paranoid," that they "get paid to worry a lot and to focus intensely" on the issue, and "***[i]n no way are we concerned that it's a quality issue***."

71.     Signaling the importance of the issue, analysts sought to confirm yet again that the claims frequency increase was related solely to miles driven and weather.  A Goldman Sachs analyst asked: "So there's not a third factor of why is this happening and what can we do about it that you are concerned about?" Winter responded: "***We are confident that we have analyzed this to death, some might say. We understand the drivers***." Winter again emphasized that the causes were external factors, stating that "***precipitation and employment rates are not Allstate-peculiar***

issues" and "***not . . . related specifically to the Company***," but instead were "***related to the general environment***."

72.     Patrick Macellaro ("Macellaro"), Allstate's Vice President of Investor Relations, acknowledged that Allstate brand auto "did experience a spike in the underlying combined ratio in the fourth quarter," and attributed the increase to "higher levels of accident frequency experienced in the first two months of the quarter," but he too claimed the frequency spike "was ***driven by a combination of increased economic activity and non-catastrophe weather.***"

73.     The market bought this story.  Analysts focused on the increase in Allstate's claims frequency, but they were misled by the Individual Defendants' repeated and emphatic assurances that the increase was externally driven.  For example, analysts from Wells Fargo Securities wrote on February 5, 2015 that the increase was a "[f]requency blip," and that "Allstate does not think the frequency increase is associated with the quality of business being written or the greater pace of business growth."

74.     The Individual Defendants continued to peddle their story that "external" factors were to blame on February 19, 2015, when they caused Allstate to file its Form 10-K, which reported the Company's financial results for fourth quarter and fiscal year 2014 (the "2014 10-K").

75.     The 2014 10-K reported on claims frequency and noted an increase in claims frequency for the fourth quarter of 2014, but again attributed its causes only to external factors, including "***severe winter weather***," "***higher miles driven***" and "***higher precipitation***."

76.     The 2014 10-K was signed by defendants Wilson, Redmond, Sprieser, Taylor, Crawford, Eskew, Mehta, Rowe, Greenberg, Henkel, Shebik, and Beyer.

77. As alleged in the Securities Action, this statement was materially false and misleading because they omitted the material fact that the Individual Defendants' greatly reduced underwriting standards for Allstate auto insurance proximately caused an increase in claims frequency, which was already having a material negative impact on the Company, including a steep $167 million decline in Allstate brand quarterly underwriting income from the third quarter of the year to the fourth.

78. After the market closed on May 5, 2015, the Individual Defendants caused Allstate to issue a press release reporting Allstate's first quarter 2015 earnings results (the "May 2015 Press Release"). The May 2015 Press Release disclosed the continuation of the increase in claims frequency. However, quoting Wilson, it further stated: "*Allstate's strategy* of building a broad based business model *continued to generate profitable growth . . . . The Allstate brand had good growth and returns in auto* . . . ."

79. That same day, Allstate filed an SEC Form 10-Q reporting the Company's financial results for the first quarter of 2015 (the "May 2015 10-Q"). The May 2015 10-Q again misattributed the cause of the increase in claims frequency to "*adverse winter weather*." In the first quarter of 2015, Allstate brand quarterly underwriting income was $144 million, which was nearly a 50% drop from the quarterly income the Allstate brand generated for the seven consecutive quarters beginning in the first quarter 2013.

80. The next day, May 6, 2015, during the May 2015 earnings call, Macellaro reported on the increase in claims frequency, but he again assured investors Allstate's claims frequency trends were closely monitored, stating, "[b]ased on our analysis *we continue to be comfortable with the quality of both our new and renewal business*." Macellaro further stated that Allstate's "analysis also reinforces our conclusion that *recent frequency fluctuations are*

-20-

*due primarily to macroeconomic trends in weather* and while we believe industry-wide auto frequency will continue its long-term downward slope over time, there will be periods of variability within that trend that are driven by external factors."

81.     When an analyst on the call stated he was confident Allstate could maintain auto margins, but was "less confident that you could continue to grow PIF at the current rate," and asked if management planned to take pricing actions that could "lose some PIF [growth] momentum," Winter responded:

> *As we talked about last quarter actually, the frequency pressure is a combination of miles driven and weather*. And I believe I said last quarter we thought that miles driven was about three times as influential as the weather. *That pattern seemed to hold up again this quarter*. . . .
>
> *[W]e did a very intense deep dive into our business to ensure that the increases in the frequency we are seeing* are proportional and consistent across multiple segments of the business no matter how you cut it, to make sure in effect that these *aren't our problems but are in fact external.*

82.     When an analyst on the call asked why the external factors were not impacting Allstate's competitors, Shebik responded, "we can't answer the question as it relates to other people." Then Shebik reassured the participants on the call by again emphasizing Allstate's visibility with respect to claim frequency trends, stating, *"[w]e can answer the question which Matt [Winter] talked extensively about which is we don't see anything [in] the way we have done our business. We have the ability to slice and dice our data as if we were our own competitor, right. So we can slice and dice it a whole bunch of ways and we do think it is comprehensive."*

83.     The market continued to buy this story.  Analysts and investors continued to be misled by the Individual Defendants' reassurances with respect to the increase in claims frequency.  For example, a May 6, 2015 analyst report from Credit Suisse Securities Research &

Analytics accepted the Individual Defendants' explanation that the problem was solely external, and thus would not impact Allstate's ability to obtain regulatory approval for planned rate increases. Therefore, they believed that any financial impact was strictly temporary. For example, the report noted that Allstate's "view is that the pickup in trend is driven by external factors so rate increases should be easier to obtain," which made the analysts "more confident that this is not an [Allstate] specific issue," enabling the Company "to push through rate at a faster than expected pace."

84.     A May 6, 2015 analyst report from RBC Capital Markets agreed, reporting that "[w]e don't believe this phenomenon is specific to just Allstate, which should make it easier for them to take corrective pricing actions without sacrificing much policy-in-force growth." In other words, the news Allstate delivered was considered positive.

85.     Other analysts also believed that because the increased frequency was purportedly the result of external factors, it would not recur. For example, on May 6, 2015 MKM Partners reported "we would expect better auto results are ahead."

**E.     The Truth Emerges**

86.     On August 3, 2015, the Individual Defendants announced a third consecutive quarter of increased claims frequency. This news was also accompanied by a poor quarterly operating income of $262 million, 57% less than the prior quarter, and disappointing operating earnings per share of $0.63, 35% less than consensus analysts' estimates.

87.     For the first time, Wilson attributed the disappointing results to 'increased frequency and severity of auto accidents,' which also "negatively impacted" loss and combined ratios. In the August 3, 2015 earnings release, Wilson admitted for the first time that "recent growth in Allstate brand auto policies in force did increase frequency, since new business

typically has higher relative frequency." In response, Wilson noted, Allstate responded with "tighter underwriting standards."

88.    On this news, the trading price of Allstate shares fell over 10% in a single day, wiping out more than $2 billion in market capitalization.

**F.    Company Insiders Liquidate Their Stock at Artificially Inflated Prices**

89.    While in possession of material nonpublic information regarding the true reasons for Allstate's increased claims frequency, several defendants liquidated their personally held Allstate stock and reaped substantial proceeds. These sales occurred while these individuals improperly caused the value of Allstate stock to be inflated with false and misleading statements about the cause of the Company's increase in claims frequency.

90.    Defendant Wilson made two trades during this time. On November 25-26, 2014, Wilson exercised options that were not due to expire until 2019 and cashed out 224,439 shares of his personal Allstate stock for $15,151,877 in unlawful insider trading proceeds. This was Wilson's first stock sale in nearly ten years. Later, on May 26, 2015, Wilson exercised more options and sold 92,786 shares of his personal Allstate stock for $6,256,560 in unlawful insider trading proceeds.

91.    On February 27, 2015, Sprieser sold 4,000 shares of Allstate stock for unlawful insider trading proceeds of $283,440.

92.    On March 11, 2015, Taylor sold 4,000 shares of Allstate stock for unlawful insider trading proceeds of $276,000.

93.    While Allstate stock sold at artificially inflated prices, Greenberg sold 6,500 shares of Allstate stock for unlawful insider trading proceeds of $453,555 on February 10, 2015 and March 5, 2015.

### G.     The Securities Action Is Sustained

94.     On February 27, 2018, Judge Gettleman issued a Memorandum Opinion and Order (the "Opinion") denying the motion to dismiss the Securities Action filed by the Company, Wilson and Winter under Fed. R. Civ. P. 12(b)(6) for alleged failure to meet the heightened pleading requirements of the PSLRA.   According to the Opinion, the plaintiffs "provide[d] numerous allegedly misleading factual statements." In so doing, Judge Gettleman specifically highlighted statements blaming external factors for the increase in the claims frequency, as well as the October 30, 2014 earnings call in which Winter alleged that Allstate's "frequency trends had been good," as false and misleading under the heightened pleading standards of the PSLRA.

95.     Nor did Judge Gettleman accept the defendants' conflicting interpretations of the alleged false and misleading statements.  As Judge Gettleman wrote:

> Defendants argue that their explanations regarding the extensive work they did to reach their conclusions, some of which were conflicting, would have caused a reasonable investor to understand that defendants' conclusions were somewhat uncertain, and their statements were therefore not misleading. Defendants' argument misses the point. Even if a reasonable investor understood defendants' conclusions to be uncertain, that understanding would have been based on incomplete information because defendants did not disclose that Allstate decreased its underwriting standards while simultaneously asserting that the increase in claims frequency was attributable to external factors.

96.     As detailed herein, Allstate's directors made the same or substantially similar false and misleading factual statements in the Company's shareholder reports and earnings releases filed with the SEC, including the 2014 10-K, which was signed by each Individual Defendant then serving as a director.

## DERIVATIVE AND DEMAND ALLEGATIONS

97.     Plaintiff brings this action derivatively in the right and for the benefit of Allstate to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

98.     Plaintiff will adequately and fairly represent the interests of Allstate and its shareholders in enforcing and prosecuting its rights.

99.     As a result of the allegations set forth herein and in accordance with Delaware law, on September 12, 2018, Plaintiff made the Demand on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company (i.e., certain of the Individual Defendants named herein).  A true and correct copy of the Demand is attached hereto at Exhibit A.

100.    The Company received the Demand on September 17, 2018.  *See* Exhibit B.

101.    It has now been seventeen months since Plaintiff issued the Demand, and Plaintiff has received no response whatsoever.  The Board's complete disregard of the Demand, which has resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.  Thus, this shareholder derivative action should be allowed to proceed

## FIRST CAUSE OF ACTION

### For Breach of Fiduciary Duty Against All Individual Defendants

102.    The Individual Defendants breached their fiduciary duties to direct Allstate's business and affairs in accordance with the laws, rules and regulations applicable to its business, including the federal securities laws, rules and regulations.

103.    The Individual Defendants breached their fiduciary duties of loyalty by allowing improper statements in the Company's press releases and SEC filings and making improper statements in the Company's SEC filings about the expected results of the Company's growth-

first strategy, and specifically, the expected and actual increase in the Company's Allstate brand automobile insurance claims frequency, loss ratio, combined ratio and/or underlying combined ratio associated with the Company's policies in force growth in the Allstate brand automobile insurance line.

104.    Further, as members of the Risk and Return Committee, Beyer, Henkel, Mehta, Sprieser, and Taylor had a duty to identify and evaluate risks inherent in the Company's business, strategy, capital structure and operating plans.  Defendants Beyer, Henkel, Mehta, Taylor and Sprieser were responsible for knowingly or recklessly allowing defendants to set a strategy for the Company that had the expected risk of negatively impacting the Allstate branded automobile insurance frequency ratios, loss ratio, combined ratio and/or the underlying combined ratio and, thus, the resulting improper statements related to the Company's earnings guidance and financial and disclosure controls.  Despite their knowledge or reckless disregard, defendants Beyer, Henkel, Mehta, Taylor and Sprieser caused the detrimental growth-first strategy to go forward and allowed the improper statements.

105.    Moreover, as members of the Audit Committee, Beyer, Crawford, Mehta, Sprieser and Taylor had duties to identify and evaluate risks inherent in the Company's business, strategy, capital structure and operating plans, and oversee the integrity of the Company's financial statements and other financial information.  Defendants Beyer, Crawford, Mehta, Sprieser and Taylor were responsible for knowingly or recklessly allowing defendants to set a strategy for the Company that had the expected risk of negatively impacting the Allstate branded automobile insurance frequency ratios, loss ratio, combined ratio and/or the underlying combined ratio and, thus, the resulting improper statements related to the Company's earnings guidance and financial and disclosure controls.  Despite their knowledge or reckless disregard,

defendants Beyer, Crawford, Mehta, Sprieser and Taylor caused the detrimental growth-first strategy to go forward and allowed the improper statements.

106.    As a result of defendants' faithless misconduct, Allstate has suffered damages, injuries and losses.

107.    Plaintiff, on behalf of Allstate, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Unjust Enrichment Against All Individual Defendants**

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Allstate.

110.    Each of the Individual Defendants received payment from Allstate, in the form of either salary or director fees, while actively breaching their fiduciary duties to Allstate.

111.    Plaintiff, as a shareholder and representative of Allstate, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

112.    Plaintiff, on behalf of Allstate, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all damages, injuries and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B.      Directing all the Individual Defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,  including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C.      Directing Allstate to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws, rules and regulations, and state corporation laws regarding fiduciary duties;

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 12, 2020

**HEFFNER HURST**

*s/ Matthew T. Hurst*
30 N. LaSalle Street, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466
Facsimile: (312) 346-2829
mhurst@heffnerhurst.com

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
rw@weiserlawfirm.com
jmf@weiserlawfirm.com

## THE ALLSTATE CORPORATION VERIFICATION

I, NORMA MIMS, hereby verify that I am familiar with the allegations in the Complaint, that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: _1 - 29 - 20_

Norma Mims

NORMA MIMS